UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KAREN COLGAN, Derivatively on Behalf of ACACIA COMMUNICATIONS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>MURUGESAN SHANMUGARAJ, BENNY P. MIKKELSEN, JOHN F. GAVIN, FRANCIS J. MURPHY, BHUPENDRA C. SHAH, CHRISTIAN J. RASMUSSEN, MEHRDAD GIVEHCHI, VINCENT T. ROCHE, STAN J. REISS, ERIC A. SWANSON, PETER Y. CHUNG, and JOHN RITCHIE,<br><br>Defendants,<br><br>- and -<br><br>ACACIA COMMUNICATIONS, INC., a Delaware corporation,<br><br>Nominal Defendant. | Case No.<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>DEMAND FOR JURY TRIAL |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT**

Plaintiff, by her attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge. This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Acacia Communications, Inc. ("Acacia" or the "Company") against certain of its officers and directors for violation of securities law, breach of fiduciary duty, waste of corporate assets, and unjust enrichment.  These wrongs resulted in hundreds of millions of dollars in damages to Acacia's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Acacia designs and sells high-speed optical interconnect[1] products, including low-power coherent digital signal processor application-specific integrated circuits, or DSP ASICs, and silicon photonic integrated circuits, or silicon PICs.  The Company integrates its products into families of optical interconnect modules with transmission speeds ranging from 100 to 400 Gigabits per second ("Gbps") for use in long-haul, metro, and inter-data center markets.[2]  More simply, Acacia designs and sells specialized products that are intended to reduce the complexity and cost of data transmission over fiber optic cables, while simultaneously improving network performance.

---

[1] "Optical interconnect" is a means of communication by fiber optic cables.  A fiber optic cable is an assembly similar to an electrical cable, but containing one or more optical fibers that are used to carry light. Different types of cable are used for different applications, for example, long distance telecommunication, or providing a high-speed data connection between different parts of a building. Optical equipment that interfaces directly with fiber relies on optical interconnect technologies that take digital signals from network equipment, perform signal processing to convert the digital signals to optical signals for transmission over the fiber network, and then perform the reverse functions on the receiving side.

[2] Long-haul networks cover distances greater than 1,500 kilometers (km) and subsea connections. Metro networks are for distances less than 1,500 km, connecting regions and cities.  Inter-data center networks are networks of various lengths connecting large data centers.

3.      Acacia markets and sells its products through its direct sales force via an extended process that requires the Company to develop strong customer relationships.  Acacia's products typically have very long sales cycles, requiring numerous discussions with prospective customers in order to better understand potential customers' network and system level requirements and technology roadmaps.  Indeed, the period of time from Acacia's initial contact with a prospective or current customer to the receipt of an actual purchase order is frequently a year or more, while prospective customers perform system and network level testing before equipment is deployed in a network carrying live traffic.  Customers also require the Company to perform extensive verification testing and qualification based on industry standards, which can take several months, and purchase arrangements may not be entered into until after this phase is completed.  According to the Company, Acacia only recognizes revenue from product sales after persuasive evidence of an arrangement exists, after delivery has occurred, after the fee is fixed or determinable, and after collection is reasonably assured.

4.      The Company derives the vast majority of its revenue from the sale of its products within its 100 and 400 Gbps product families, and a substantial majority of Acacia's products are currently sold to network equipment manufacturers, with approximately 60% of overall sales attributable to just two customers.  Acacia further expects network equipment manufacturers to continue to be Acacia's primary customers for the foreseeable future.

5.      Shortly after the Company's May 2016 initial public offering ("IPO"), the Individual Defendants (as defined herein) began repeatedly touting that: (i) there was purportedly "strong global demand" for Acacia's core products, with particularly strong demand in China; (ii) the Company maintained a strong balance sheet with "substantial capacity to further grow;" (iii) Acacia had "broad expertise" in advanced technologies, methodologies, and processes; and (iv) the Company

continuously engaged with customers, thus had a "deep understanding" of current and future market needs. The Individual Defendants further repeatedly touted that Acacia expected significant revenue growth and increased demand for its core products.

6.      All of the above representations were misleading. In fact, Acacia's top two customers had long been experiencing significant problems that were limiting their demand for the Company's products, and a substantial portion of Acacia's growth was actually attributable to certain infrastructure projects in China that were virtually completed, thus those customers would not need to purchase more of Acacia's products. To make matters worse, certain quality control issues were causing problems with some of the Company's already shipped products, thus forcing Acacia to divert its attention to affected customers for remediation.

7.      Unfortunately, the Individual Defendants did not begin to reveal these significant struggles until *after* Acacia's Board of Directors (the "Board") effectuated a secondary public stock offering ("SPO") on or about October 7, 2016, which priced Acacia at $100 per share. The SPO was designed to and did allow various insiders, including a majority of the Board, to collectively *dump hundreds of millions of dollars' worth* of Acacia stock at artificially inflated prices, at an average price of approximately $96.50 per share.

8.      Less than three weeks after the SPO, on October 27, 2016, Acacia's largest customer, ZTE Kangxum Telecom Co. Ltd. ("ZTE"), reported dismal sales for the third quarter of 2016, and proved even worse sales guidance for the 2016 fiscal year. Similarly, on the same day, the Company's second largest customer, ADVA Optical Networking North America, Inc. ("ADVA"), also issued soft 2016 earnings guidance. On this news, Acacia's stock price tumbled over 15% on October 27, 2016, to close at $73.66, erasing nearly $500 million in market capitalization in a single day.

9.      Over the next three quarters, as further detailed herein, various negative information concerning the Company's business slowly trickled out in a series of announcements and articles. Throughout this time, the Company's stock price continued to tumble and the Individual Defendants repeatedly issued various misleading statements in attempt to prop up price, while at the same time dumping thousands more of their personally held, artificially inflated Acacia stocks, for tens of millions of dollars more in ill-gotten proceeds.  By the time the full truth finally emerged in mid-July 2017, Acacia's stock price had fallen to just $39.  The Insider Selling Defendants (as defined herein) fared much better however, collectively selling 4,326,348 artificially inflated shares between the October 2016 SPO and July 14, 2017, for proceeds of just under $328 million, with a weighted average sale price of over $75 per share.

10.     The Individual Defendants' actions have devastated Acacia, as is evident from the steady 56% stock drop that occurred between October 7, 2016, the date of the SPO, and July 2017, when the full truth was finally revealed.  During the course of these three quarters, the slow trickle of revelations concerning the true nature of Acacia's business and prospects wiped out over **_$2 billion_** of the Company's market capitalization.  More, multiple class action complaints have been filed in this Court against the Company and certain Individual Defendants alleging violations of the federal securities laws in connection with certain false statements concerning the Company's business and operations (the "Securities Class Actions").

11.     To make matters worse, on April 6, 2017, the Board negligently filed a materially misleading Proxy Statement on Schedule 14A (the "Proxy") with the SEC.  The Proxy urged stockholders to vote to reelect two directors, defendants Murugesan Shanmugaraj ("Shanmugaraj"), the Company's President and Chief Executive Officer ("CEO"), and Benny P. Mikkelsen ("Mikkelsen"), one of the Company's founders and Chief Technology Officer ("CTO").  The Proxy,

however, misleadingly assured investors that the Board adequately oversees Acacia's risks and meaningfully implements relevant internal controls.  Further, although the Proxy notes that defendants Shanmugaraj and Mikkelsen collectively sold approximately $20 million worth of stock during the SPO, the Proxy failed to disclose that the stock price was artificially inflated at the time, and that such sales were improperly made while each of these defendants was in possession of material, nonpublic information.

12.     Plaintiff brings this action against the Individual Defendants to repair the harm that they caused with their faithless actions.

## JURISDICTION AND VENUE

13.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

14.     Jurisdiction is conferred by 28 U.S.C. §1332.  Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interests and costs.

15.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because:  (i) Acacia maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions

and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Acacia, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**Plaintiff**

17.     Plaintiff Karen Colgan was a stockholder of Acacia at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Acacia stockholder.  Plaintiff is a citizen of Arizona.

**Nominal Defendant**

18.     Nominal defendant Acacia is a Delaware corporation with principal executive offices located at Three Mill and Main Place, Suite 400, Maynard, Massachusetts.  Accordingly, Acacia is a citizen of Delaware and Massachusetts.  Acacia develops, manufactures, and markets coherent optical interconnect products for cloud infrastructure operators and content and communication service providers.  As of December 31, 2016, Acacia had 290 full-time employees.

**Defendants**

19.     Defendant Shanmugaraj is Acacia's President, CEO, and a director and has been since April 2010.  Defendant Shanmugaraj is named as a defendant in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act and sections 11,12(a), and 15 of the Securities Act of 1933 (the "Securities Act").  Defendant Shanmugaraj knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the decreasing demand for Acacia's core products, particularly with respect to demand from the Company's largest customers; and (ii) the quality

control issues that were stretching the Company as it attempted to remediate problematic product shipments while also meeting demand for new product orders. Defendant Shanmugaraj also negligently violated section 14(a) of the Exchange Act by causing Acacia to make misleading statements in its Proxy. While in possession of material, nonpublic information concerning Acacia's true business health, defendant Shanmugaraj sold 189,175 shares of his stock for $15,038,839.56 in proceeds. Acacia paid defendant Shanmugaraj the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2016 | $299,923 | $1,707,500 | $361,620 | $24,097 | $2,393,140 |

Defendant Shanmugaraj is a citizen of Massachusetts.

20.     Defendant Mikkelsen is Acacia's cofounder and CTO and a director and has been since June 2009. Defendant Mikkelsen is named as a defendant in a related securities class action complaint that alleges he violated sections 11, 12(a), and 15 of the Securities Act. Defendant Mikkelsen knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the decreasing demand for Acacia's core products, particularly with respect to demand from the Company's largest customers; and (ii) the quality control issues that were stretching the Company as it attempted to remediate problematic product shipments while also meeting demand for new product orders. Defendant Mikkelsen also negligently violated section 14(a) of the Exchange Act by causing Acacia to make misleading statements in its Proxy. While in possession of material, nonpublic information concerning Acacia's true business health, defendant Mikkelsen sold 289,247 shares of his stock for $20,269,536.59 in proceeds. Defendant Mikkelsen is a citizen of Massachusetts.

21.     Defendant John F. Gavin ("Gavin") is Acacia's Chief Financial Officer ("CFO") and has been since February 2012.  Defendant Gavin is named as a defendant in related securities class action complaints that allege he violated sections 10(b) and 20(a) of the Exchange Act and sections 11, 12(a), and 15 of the Securities Act.  Defendant Gavin knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the decreasing demand for Acacia's core products, particularly with respect to demand from the Company's largest customers; and (ii) the quality control issues that were stretching the Company as it attempted to remediate problematic product shipments while also meeting demand for new product orders.  While in possession of material, nonpublic information concerning Acacia's true business health, defendant Gavin sold 48,630 shares of his stock for $3,699,330.42 in proceeds.  Acacia paid defendant Gavin the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2016 | $246,808 | $1,410,000 | $213,200 | $29,451 | $1,899,459 |

Defendant Gavin is a citizen of Massachusetts.

22.     Defendant Francis J. Murphy ("Murphy") is Acacia's Corporate Controller and has been since November 2013.  Defendant Murphy is named as a defendant in a related securities class action complaint that alleges he violated sections 11, 12(a), and 15 of the Securities Act.  Defendant Murphy knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the decreasing demand for Acacia's core products, particularly with respect to demand from the Company's largest customers; and (ii) the quality control issues that were stretching the Company as it attempted to remediate problematic product shipments while also meeting demand for new product orders.  While in possession of material,

nonpublic information concerning Acacia's true business health, defendant Murphy sold 34,458 shares of his stock for $2,122,673.53 in proceeds.  Defendant Murphy is a citizen of Massachusetts.

23.     Defendant Bhupendra C. Shah ("Shah") is Acacia's Vice President of Engineering and has been since June 2009.  Defendant Shah is named as a defendant in a related securities class action complaint that alleges he violated section 12(a) of the Securities Act.  Defendant Shah knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings concerning: (i) the decreasing demand for Acacia's core products, particularly with respect to demand from the Company's largest customers; and (ii) the quality control issues that were stretching the Company as it attempted to remediate problematic product shipments while also meeting demand for new product orders.  While in possession of material, nonpublic information concerning Acacia's true business health, defendant Shah sold 132,298 shares of his stock for $9,506,575.33 in proceeds.  Acacia paid defendant Shah the following compensation as an executive:

| Year | Salary | Stock Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|----------------------------------------|------------------------|-------|
| 2016 | $246,808 | $1,410,000 | $213,200 | $24,395 | $1,894,403 |

Defendant Shah is a citizen of Massachusetts.

24.     Defendant Christian J. Rasmussen ("Rasmussen") is Acacia's cofounder and Vice President of Digital Signal Processing and Optics and has been since June 2015.  Defendant Rasmussen was also Acacia's Director of Digital Signal Processing and Optics from June 2009 to June 2015.  Defendant Rasmussen is named as a defendant in a related securities class action complaint that alleges he violated section 12(a) of the Securities Act.  Defendant Rasmussen knowingly, recklessly, or with gross negligence made improper statements in the Company's press

releases and public filings concerning: (i) the decreasing demand for Acacia's core products, particularly with respect to demand from the Company's largest customers; and (ii) the quality control issues that were stretching the Company as it attempted to remediate problematic product shipments while also meeting demand for new product orders.  While in possession of material, nonpublic information concerning Acacia's true business health, defendant Rasmussen sold 293,121 shares of his stock for $20,476,861.42 in proceeds.  Defendant Rasmussen is a citizen of Massachusetts.

25.     Defendant Mehrdad Givehchi ("Givehchi") is Acacia's cofounder and Vice President of Hardware and Software and has been since June 2015.  Defendant Givehchi was also Acacia's Director of Hardware and Software from June 2009 to June 2015.  Defendant Givehchi is named as a defendant in a related securities class action complaint that alleges he violated section 12(a) of the Securities Act.  While in possession of material, nonpublic information concerning Acacia's true business health, defendant Givehchi sold 289,193 shares of his stock for $20,285,090.81 in proceeds. Defendant Givehchi is a citizen of Massachusetts.

26.     Defendant Vincent T. Roche ("Roche") is Acacia's Chairman of the Board and has been since at least September 2017 and a director and has been since June 2016.  Defendant Roche is also a member of Acacia's Compensation Committee and has been since at least May 2016. Defendant Roche is named as a defendant in a related securities class action complaint that alleges he violated sections 11, 12(a), and 15 of the Securities Act.  Defendant Roche knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the decreasing demand for Acacia's core products, particularly with respect to demand from the Company's largest customers; and (ii) the quality control issues that were stretching the Company as it attempted to remediate problematic product shipments while also meeting demand for new product

orders.  Defendant Roche also negligently violated section 14(a) of the Exchange Act by causing Acacia to make misleading statements in its Proxy.  Acacia paid defendant Roche the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Stock Awards | Total |
|---|---|---|---|
| 2016 | $24,100 | $379,513 | $403,613 |

Defendant Roche is a citizen of Massachusetts.

27.     Defendant Stan J. Reiss ("Reiss") is an Acacia director and has been since August 2009.  Defendant Reiss is also the Chairman of Acacia's Compensation Committee and has been since at least April 2017 and a member of that committee and has been since at least May 2016. Defendant Reiss was a member of Acacia's Audit Committee from at least May 2016 to at least April 2017.  Defendant Reiss is named as a defendant in a related securities class action complaint that alleges he violated sections 11, 12(a), and 15 of the Securities Act.  Defendant Reiss knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the decreasing demand for Acacia's core products, particularly with respect to demand from the Company's largest customers; and (ii) the quality control issues that were stretching the Company as it attempted to remediate problematic product shipments while also meeting demand for new product orders.  Defendant Reiss also negligently violated section 14(a) of the Exchange Act by causing Acacia to make misleading statements in its Proxy.  While in possession of material, nonpublic information concerning Acacia's true business health, defendant Reiss sold 1,446,104 shares of his stock for $139,549,036 in proceeds.  Defendant Reiss is a citizen of Massachusetts.

28.     Defendant Eric A. Swanson ("Swanson") is an Acacia director and has been since August 2009.  Defendant Swanson was also Acacia's Chairman of the Board from August 2009 to at least April 2017.  Defendant Swanson is named as a defendant in a related securities class action

complaint that alleges he violated sections 11, 12(a), and 15 of the Securities Act.  Defendant Swanson knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the decreasing demand for Acacia's core products, particularly with respect to demand from the Company's largest customers; and (ii) the quality control issues that were stretching the Company as it attempted to remediate problematic product shipments while also meeting demand for new product orders.  Defendant Swanson also negligently violated section 14(a) of the Exchange Act by causing Acacia to make misleading statements in its Proxy.  While in possession of material, nonpublic information concerning Acacia's true business health, defendant Swanson sold 2,640 shares of his stock for $254,760 in proceeds.  Defendant Swanson is a citizen of Massachusetts.

29.     Defendant Peter Y. Chung ("Chung") is an Acacia director and has been since April 2013.  Defendant Chung is also a member of Acacia's Audit Committee and Compensation Committee and has been since at least May 2016.  Defendant Chung is named as a defendant in a related securities class action complaint that alleges he violated sections 11, 12(a), and 15 of the Securities Act.  Defendant Chung knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the decreasing demand for Acacia's core products, particularly with respect to demand from the Company's largest customers; and (ii) the quality control issues that were stretching the Company as it attempted to remediate problematic product shipments while also meeting demand for new product orders.  Defendant Chung also negligently violated section 14(a) of the Exchange Act by causing Acacia to make misleading statements in its Proxy.  While in possession of material, nonpublic information concerning Acacia's true business health, defendant Chung sold 1,596,202 shares of his stock for $96,220,993 in proceeds.  Defendant Chung is a citizen of California.

30.     Defendant John Ritchie ("Ritchie") is an Acacia director and has been since April 2015.  Defendant Ritchie is also the Chairman of Acacia's Audit Committee and has been since at least April 2017, and a member of that committee and has been since at least May 2016.  Defendant Ritchie is named as a defendant in a related securities class action complaint that alleges he violated sections 11, 12(a), and 15 of the Securities Act.  Defendant Ritchie knowingly or recklessly made improper statements in the Company's press releases and public filings concerning: (i) the decreasing demand for Acacia's core products, particularly with respect to demand from the Company's largest customers; and (ii) the quality control issues that were stretching the Company as it attempted to remediate problematic product shipments while also meeting demand for new product orders.  Defendant Ritchie also negligently violated section 14(a) of the Exchange Act by causing Acacia to make misleading statements in its Proxy.  While in possession of material, nonpublic information concerning Acacia's true business health, defendant Ritchie sold 5,280 shares of his stock for $379,368 in proceeds.  Defendant Ritchie is a citizen of California.

31.     The defendants identified in ¶¶19-25 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶19-20, 26-30 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶27, 29-30 are referred to herein as the "Audit Committee Defendants."  The defendants identified in ¶¶19-25, 27-30 are referred to herein as the "Insider Selling Defendants."   Collectively, the defendants identified in ¶¶19-30 are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

32.     By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Acacia and its stockholders fiduciary obligations of trust,

loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Acacia in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Acacia and not in furtherance of their personal interest or benefit.

33. To discharge their duties, the officers and directors of Acacia were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Acacia were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations;

(b) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and refrain from engaging in deceptive or fraudulent conduct;

(c) refrain from selling Acacia stock on the basis of nonpublic insider information;

(d) ensure processes were in place for maintaining the integrity and reputation of the Company and reinforcing a culture of ethics, compliance, and appropriate risk management;

(e) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(f) remain informed as to how Acacia conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in

connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(g)     truthfully and accurately guide investors and analysts as to the business operations of the Company at any given time.

**Breaches of Duties**

34.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as officers and directors of Acacia, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Individual Defendants were aware or reckless in not being aware posed a risk of serious injury to the Company.

35.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in unlawful and unsafe business practices, improper practices that wasted the Company's assets, and caused Acacia to incur substantial damage.

36.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Acacia, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Acacia has expended, and will continue to expend, significant sums of money.

**Additional Duties of the Audit Committee Defendants**

37.     In addition to these duties, under its Charter, the Audit Committee Defendants, defendants Chung, Reiss, and Ritchie, owed specific duties to Acacia to assist the Board in overseeing "the Company's accounting and financial reporting processes and the audits of the

Company's financial statements."  Moreover the Audit Committee's Charter provides that the Audit

Committee Defendants were required perform the following specific relevant duties:

### Audited Financial Statements

7. Review and Discussion. The Audit Committee shall review and discuss with the Company's management and independent auditor the Company's audited financial statements, including the matters required to be discussed by AS 16.

8. Recommendation to Board Regarding Financial Statements. The Audit Committee shall consider whether it will recommend to the Board that the Company's audited financial statements be included in the Company's Annual Report on Form 10-K.

9. Audit Committee Report. The Audit Committee shall prepare an annual committee report for inclusion where necessary in the proxy statement of the Company relating to its annual meeting of security holders.

### Review of Other Financial Disclosures

10. Independent Auditor Review of Interim Financial Statements. The Audit Committee shall direct the independent auditor to use its best efforts to perform all reviews of interim financial information prior to disclosure by the Company of such information and to discuss promptly with the Audit Committee and the Chief Financial Officer any matters identified in connection with the auditor's review of interim financial information which are required to be discussed by applicable auditing standards. The Audit Committee shall direct management to advise the Audit Committee in the event that the Company proposes to disclose interim financial information prior to completion of the independent auditor's review of interim financial information.

11. Earnings Release and Other Financial Information. The Audit Committee shall discuss generally the type and presentation of information to be disclosed in the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts, rating agencies and others.

12. Quarterly Financial Statements. The Audit Committee shall discuss with the Company's management and independent auditor the Company's quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

### Other Duties

13. Controls and Procedures. The Audit Committee shall coordinate the Board's oversight of the Company's internal control over financial reporting, disclosure controls and procedures and code of conduct. The Audit Committee shall receive and

review the reports of the Chief Executive Officer and the Chief Financial Officer required by Rule 13a-14 under the Exchange Act.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

38.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

39.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including stockholders of Acacia, regarding the Individual Defendants' management of Acacia's operations; (ii) facilitate defendants Chung, Gavin, Givehchi, Mikkelsen, Murphy, Rasmussen, Reiss, Ritchie, Shah, Shanmugaraj, and Swanson's illicit sale of over $327.8 million worth of  their personally held shares while in possession of material, nonpublic information; and (iii) enhance the Individual Defendants' executive and directorial positions at Acacia and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

40.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

41.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants'

violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

42.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

43.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

## FACTUAL BACKGROUND

44.     Acacia designs and sells products which are intended to deliver high-speed communications technology that increases the bandwidth, increases overall performance, and reduces costs for carriers, data centers, and cloud providers.  The Company markets and sells its products through its direct sales force via an extended, often a year or more long, process that requires the Company to develop strong customer relationships with a select few customers. Throughout the sales process, prospective customers perform system and network level testing before equipment is deployed in a network carrying live traffic, and customers also require the Company to perform extensive verification testing and qualification based on industry standards. Further, according to Acacia's SEC filings, the Company only recognizes revenue "when persuasive

evidence of an arrangement exists, delivery has occurred, the fee is fixed or determinable, and collectability of the related receivable is reasonably assured."

45.     In 2016, Acacia had just twenty-five customers, most or all of which were network equipment manufacturers.  The Company has historically (and currently) generated the majority of its revenue from just a few of its customers.  For example, in 2016, 2015, and 2014, Acacia's five largest customers in each period (which differed by period) collectively accounted for 78%, 74%, and 78% of the Company's revenue, respectively.  For the same three years, Acacia's two largest customers, ADVA and ZTE, collectively accounted for 58%, 50%, and 58% of the Company's overall revenue, respectively.  The Company expects network equipment manufacturers to continue to be Acacia's primary customers for the foreseeable future.

46.     On May 18, 2016, Acacia completed its IPO.  Through the IPO, the Company issued and sold over 4.5 million shares of common stock to the public at $23 per share, receiving over $105 million in gross proceeds.  As detailed below, over the following months leading up to and commensurate with the October 2016 SPO, the Individual Defendants caused or allowed a variety of misleading statements to be issued about the Company's business prospects, sending Acacia's stock price soaring.

### THE INDIVIDUAL DEFENDANTS REPEATEDLY MISREPRESENT THE COMPANY'S BUSINESS AND PROSPECTS WHILE DUMPING THEIR ARTIFICIALLY INFLATED ACACIA STOCK

47.     On August 11, 2016, Acacia issued a press release announcing its second quarter 2016 financial results and providing glowing guidance for the third quarter.  According to the press release, Acacia achieved impressive revenue of $116.2 million, up 101%, and a staggering increase to net income up 247% year-over-year.  Ignoring the fact that the Company's top two customers were experiencing operational and sales problems that were limiting demand for Acacia products, for the

third quarter of 2016, the press release touted guidance of $120 million to $128 million in revenue, non-generally accepted accounting principles ("GAAP")  net income of $26 million to $31 million, and non-GAAP diluted earnings per share ("EPS") of $0.64 to $0.76.  Defendant Shanmugaraj boasted that the "second quarter results exceeded [Acacia's] expectations across the board and reflect the success of [the Company's] disruptive technology in transforming cloud, content and communications networks."  Defendant Shanmugaraj further proclaimed that the impressive results were "a testament to [Acacia's] strategy and demonstrate [the Company's] leadership position in the high-growth 100G plus optical networking market," and that "[Acacia] continue[d] to see strong global demand for [its] products, driven by metro and inter-data center network infrastructure buildouts."  Defendant Gavin added that the "IPO enabled [Acacia] to strengthen [the Company's] balance sheet while providing substantial capacity to further grow the business."

48.     Later the same day, Acacia conducted an earnings conference call with analysts and investors.  During the call, defendants Shanmugaraj and Gavin continued to boast about Acacia's current and future growth.  Further, although the Company's two largest customers were beginning to reduce purchases from the Company and demand was also waning in China because its 4G infrastructure buildout was nearing completion, defendants Shanmugaraj and Gavin touted purported increased demand for the Company's products across all regions, particularly China.  Defendants Shanmugaraj and Gavin stated:

[Defendant Shanmugaraj]

***The market opportunity we are targeting is large and growing***. The growth in bandwidth demand has caused an increase in investments across long-haul, metro and inter-data center networks with most of that investment focused on speeds up 100G and higher. With the growth of large data centers and content moving closer to the consumer, we are seeing strong demand for our products across metro and inter-data center networks.

Geographically, we are seeing demand across all regions while **demand from China is particularly strong**. Our customer base has grown from eight customers in 2011 to more than 25 customers in the first half of 2016. We have seen substantial increases in customer revenue in the past four years from our original eight customers. They have increased both the volume and the number of products they purchased from us. And we believe, we will see similar increases from our newer customers going forward.

**Our growth is being driven by strong global demand** from metro and inter-data center network buildouts. We believe that the industry is in the early stages of a multi-year buildout cycle of 100G, 200G and 400G technology. These buildouts are happening in long-haul including submarine and in metro and inter-data center networks.

In the second quarter, we saw a step function increase in demand driven by deployments in all of our growth markets. We started to see this demand increase beginning late in the first quarter and continuing into the second quarter which enabled us to achieve a revenue growth rate of 91% year-over-year in the first half of 2016. **We expect similar growth to continue into the second half of 2016**.

During the second quarter, total revenues grew to $116.2 million, an increase of 101% year-over-year driven primarily by an increase in sales of our 100G CFP digital coherent optics or CFP-DCO products as well as the ramp of our new 400G product family. At the same time, we recorded non-GAAP net income in the second quarter of $28.9 million compared to $6.1 million in the second quarter of 2015.

\* \* \*

[Defendant Gavin]

…Total revenue of $116.2 million for the second quarter of 2016 rose 101% from revenue of $57.9 million in the second quarter of 2015. **This growth was driven by continued strong global demand for metro and inter-data center network buildouts with particularly strong demand from the China market**.

49.     The following day, on August 12, 2016, Acacia's stock price skyrocketed in light of the Individual Defendants' misstatements, increasing approximately 40% to close at $95.67 per share.

50.     On September 26, 2016, in anticipation of the SPO, Acacia filed a Form S-1 Registration Statement with the SEC.  The Form S-1 revealed that the Company intended to issue and sell up to $125 million worth of its common stock, and that certain of the Company's

stockholders would sell up to an additional $325 million worth of their personally held shares. The same day, the Company filed a Current Report on Form 8-K with the SEC disclosing Acacia's "Financial Outlook for the Third Quarter of 2016." According to the Form 8-K, Acacia had raised its revenue guidance for the third quarter of 2016 and "the Company [now] expect[ed] revenue of $127 million to $131 million," compared to previous guidance of $120 million to $128 million.

51.     On October 4, 2016, the Company filed with the SEC an Amended Registration Statement on Form S-1/A (the "Registration Statement"). The Registration Statement was signed by Officer Defendants Shanmugaraj, Gavin, and Murphy, and Director Defendants Shanmugaraj, Swanson, Chung, Mikkelsen, Reiss, Ritchie, and Roche. The Registration Statement touted that Acacia had "experienced rapid revenue growth over the last several years," and that the Company "expect[ed] to generate additional revenue through sales to [its existing] customers" and as a result of "increased demand for [its] products," but failed to disclose that sales demands from some of the Company's largest customers were in the process of winding down. The Registration Statement stated:

> We sell our products through a direct sales force to leading network equipment manufacturers. The number of customers who have purchased and deployed our products has increased from eight in 2011 to more than 25 during the twelve months ended June 30, 2016. ***We have experienced rapid revenue growth over the last several years***. Our revenue for 2015 was $239.1 million, a 63.5% increase from $146.2 million of revenue in 2014. Our revenue for the six months ended June 30, 2016 was $200.7 million, a 91.0% increase from $105.1 million of revenue in the six months ended June 30, 2015. In 2015, we generated net income of $40.5 million and our adjusted [earnings before interest, taxes, depreciation, and amortization ("EBITDA")] was $47.5 million, compared to net income of $13.5 million and adjusted EBITDA of $20.4 million in 2014. For the six months ended June 30, 2016, we generated net income of $32.2 million and our adjusted EBITDA was $52.6 million, compared to net income of $9.0 million and adjusted EBITDA of $17.7 million for the six months ended June 30, 2015. See "Selected Consolidated Financial Data—Non-GAAP Financial Measures" for more information regarding our use of adjusted EBITDA and other non-GAAP financial measures and a reconciliation of adjusted EBITDA to net income.

* * *

**Our Growth Strategy**

Our goal is to become the leading provider of high-speed optical interconnect technology that underpins the world's data and communication networks. To grow our business and achieve our vision, we are pursuing the following strategies:

* * *

***Increase penetration within our existing customer base***. As we continue to enhance and expand our product families, and as our existing customers seek to expand and improve their network equipment technology, ***we expect to generate additional revenue through sales to these customers***.

* * *

Our revenue has generally increased over the periods presented due to ***increased demand for products*** in our 100 Gbps product family, as well as the introduction of new products in our 400 Gbps product family. In 2014, we experienced a decline in revenue in the fourth quarter compared to the third quarter due to our customers' ability to delay or reschedule shipments under the terms of their contracts with us, resulting in $4.0 million of anticipated purchases by two customers being delayed to the first quarter of 2015.

52.     The Registration Statement also boasted that Acacia had "broad expertise" in design and manufacturing, and further assured investors that the Company "continuously engage[d] with [its] customers" and had "deep insights into current and future market needs."  The Registration Statement stated:

Our engineering and management teams have extensive experience in optical systems and networking, digital signal processing, large-scale ASIC design and verification, silicon photonic integration, system software development, hardware design and high-speed electronics design. This ***broad expertise*** in a range of advanced technologies, methodologies and processes enhances our innovation, design and development capabilities and has enabled us to develop and introduce ten optical interconnect modules, five coherent DSP ASICs and three silicon PICs since 2009. Our sixth coherent DSP ASIC is currently under development and anticipated to be introduced in the fourth quarter of 2016. In the course of our product development cycles, ***we continuously engage with our customers*** as they design their current and next-generation network equipment, which provides us with ***deep insights into the current and future market needs***.

* * *

**Customer collaboration provides deep understanding of market needs.** We collaborate closely with our customers, as well as directly with many cloud and service providers, which allows us to better understand their needs and anticipate next generation product and service requirements.

53.     With respect to manufacturing, the Registration Statement stated that the Company

contracts and works closely with certain third-party contract manufacturers, and that the Company

requires these third parties to meet high quality and reliability standards, stating:

**We contract with third parties to manufacture, assemble and test our products**. We utilize a range of [complementary metal oxide semiconductor ("CMOS")] and CMOS-compatible processes to develop and manufacture the coherent DSP ASICs and silicon PICs that are designed into our modules. We select the semiconductor process and foundry that provides the best combination of performance, cost and feature attributes necessary for our products. For several of our products, a single foundry fab is selected for semiconductor wafer production.

**We contract with three third-party contract manufacturers to test, build and inspect modules incorporating our coherent DSP ASICs and silicon PICs for high-volume production of our modules.** Our contract manufacturers also implement many customer-specific configurations and packaging before customer shipments. **We build the test systems used by our contract manufacturers**. We also directly manufacture prototype products and limited production quantities during initial new product introduction.

We believe our outsourced manufacturing model enables us to focus our resources and expertise on the design, sale, support and marketing of our products to best meet customer requirements. We also believe that **this manufacturing model provides us with the flexibility required to respond to new market opportunities and changes in customer demand, simplifies the scope of our operations and administrative processes and significantly reduces our working capital requirements, while providing the ability to scale production rapidly**.

**We subject our third-party manufacturing contractors and foundries to qualification requirements in order to meet the high quality and reliability standards required of our products. Our engineers and supply chain personnel work closely with third-party contract manufacturers and fab foundries to increase yield, reduce manufacturing costs, improve product quality and ensure that component sourcing strategies are in place to support our manufacturing needs.**

54.     On October 6, 2016, Acacia issued a press release announcing the pricing of its SPO of 4.5 million shares of the Company's common stock at a price to the public of $100 per share.  The offering consisted of 1,210,302 shares from Acacia and 3,289,698 shares "from certain existing stockholders."  In connection with the SPO, Acacia issued and sold 1,210,302 shares of stock, receiving approximately $121 million in gross proceeds.  At the same time, as detailed in the below table, the Insider Selling Defendants collectively dumped over 2.275 million shares at an average price of $96.50 per share, reaping over $219.6 million in proceeds.  Of these insider stock sales, over two million shares were sold by defendants Chung, Mikkelsen, Reiss, Ritchie, Shanmugaraj, and Swanson on October 13, 2016, for proceeds of more than $193.4 million.

| DEFENDANT SPO SALES | | |
|---|---|---|
| **Defendant** | **Shares** | **Transaction Value** |
| CHUNG - Director | 346,202 | $33,408,493.00 |
| GAVIN – CFO | 25,501 | $2,460,846.50 |
| GIVEHCHI – Vice President | 98,846 | $9,538,639.00 |
| MIKKELSEN – Director, CTO | 98,846 | $9,538,639.00 |
| REISS - Director | 1,446,104 | $139,549,036.00 |
| RITCHIE - Director | 2,640 | $254,760.00 |
| SHAH – Vice President of Engineering | 47,917 | $4,623,990.50 |
| SHANMUGARAJ – Director, President, CEO | 108,163 | $10,437,729.50 |
| RASMUSSEN – Vice President | 98,846 | $9,538,639.00 |
| SWANSON - Director | 2,640 | $254,760.00 |
| **TOTAL** | **2,275,705** | **$219,605,760.50** |

## THE TRUTH SLOWLY EMERGES AS THE INDIVIDUAL DEFENDANTS CONTINUE TO MISREPRESENT THE COMPANY'S PROSPECTS WHILE DUMPING THEIR ARTIFICIALLY INFLATED ACACIA STOCK

55.     The truth behind the Company's business prospects and Individual Defendants' wrongdoing began to emerge just two weeks after a majority of the Insider Selling Defendants collectively dumped over two million Acacia shares for proceeds of more than $193.4 million.  On October 27, 2016, Acacia's two largest clients, ZTE and ADVA, both reported soft guidance.  In

particular, Acacia's largest customer, ZTE, which accounted for approximately 40% of Acacia's sales during the first half of 2016, reported revenue for the third quarter of 23.8 billion yuan, which was well below the market analysts' consensus estimate of 26.27 billion yuan for that period, noting that pressures from a weak global macroeconomy impacted the telecommunications industry in the past three quarters.  Similarly, ADVA, Acacia's second-largest customer, issued fourth-quarter revenue guidance of 125 million euros to 140 million euros, significantly below consensus estimate of 149 million euros.  ADVA also disclosed that it had fallen roughly three months behind in rolling out a project that utilized Acacia's products.

56.     The disappointing results from Acacia's two largest customers caused the Company's stock to tumble over 15% on October 27, 2016, closing at $73.66 per share.

57.     On November 10, 2016, Acacia issued a press release reporting its financial results for the third quarter 2016.  The Company reported revenue of $135.3 million, up 107%, and net income up 295% year-over year.  Defendant Shanmugaraj attributed the apparently impressive results to "strong global demand for [Acacia] products," thus suggesting that strong results would continue for the foreseeable future.  Unfortunately, this was not the case.

58.     During a follow-up earnings conference call the same day, defendants Shanmugaraj and Gavin sought to downplay the negative impact of the soft guidance provided by Acacia's top two customers, ZTE and ADVA.  Specifically, when questions about the "customer concentration issue" in relation to their soft guidance, defendants Shanmugaraj and Gavin intimated that growth from smaller customers would make up for the ZTE and ADVA declines, stating:

[Analyst]

Thanks for taking my questions. The first one I want to touch on is actually a bit of ***the customer concentration issues*** as well. And the 10-Q is out, so we can get a pretty detailed look at what those customers are.

And what strikes me and what ***I want to get your response on is the three big customers that have been that way for the past few quarters were still 69% of sales, which is basically the same that it has been for the past two quarters during the year as well. So I'm wondering if you can give a little bit more detail onto that diversification***.

And then ***related to two out of those three big customers, one already guided for pretty significant sequential declines in the fourth quarter. So I'm wondering as we look in the fourth quarter, should we really see a material ramp-up in the new customer revenue contributions to offset some of those potential declines?***

[Defendant Shanmugaraj]

Yes, so good question. Let me take a crack at it, Doug, and maybe John can chime in. As we said, the customer concentration, while there is not an addition of another 10% customer, we made two references. One is that ***we have added two top-tier customers into our top five***, which was not the case before. It was in Q2, but not before that. ***So we are happy with the ramp of our top-tier customers.***

Number two is these are 18- to 24-month lead time development. So in other words, it is not something that we take in and they plug in like a client side and off to market they go within a couple of months.

These are 18 to 24. We -- they have to develop their product, integrate our product, then qualify our product and take it to their customers, qualify in their customers. So it is a -- it takes time. And that is the other piece of it.

So while we don't have a new 10% customer, we have 2 of those in the top five. And also, as I said in my section, the new customers accounted for 37% sequential growth quarter over quarter. And we see that growth continuing, which is also what -- the point I made about the -- ***to offset some of the seasonality***.

So it will take time at this point, and at the right time, obviously, we will share with you as soon as the customer crosses that 10% threshold. But the way to look at it as we have several of these that are not at the 10% level, but ***we're very happy with the progress of our newer customers***.

[Defendant Gavin]

And Doug, I will just add to that. As I said in my prepared remarks, 25% of our revenue in Q3 was from that new customer set. It's the highest percent contribution of that group to date. And we expect that to grow again in Q4 and through the quarters starting in 2017. So we are seeing that start to ramp up, and we just had some customers in Q3 from the original customer group that had large quarter for them in Q3.

\* \* \*

[Defendant Shanmugaraj]

And again, the part B question was about what about the customers who guided, and I think I covered a little bit of that earlier. One is that a customer like ZTE, for example, has all the way from mobile to handset to optical.

So is very hard. ***We don't see any slowdown in the 100G and about optical segment from a customer like ZTE, for example. So just because they claim they've guided some number***, which we can't really comment on. What we can say is that ***we don't see any slowdown in that ramp. And of course, it is being offset, as we talk about, with the new customers ramping up as well.***

59.     Over the next few months, defendant Murphy, Acacia's Corporate Controller, dumped thousands of shares of Acacia stock, priced between about $60 and $70 dollars per share, many of which were not sold pursuant to a 10b5-1 trading plan, including: 1,582 shares sold on November 15, 2016, for proceeds of $109,458.58; 3,785 shares sold on December 15, 2016, for proceeds of $252,758.01; 6,752 shares sold on January 1, 2017, for proceeds of $419,636.80; and 1,608 shares sold on January 30, 2017, for proceeds of $97,557.36.  Several other Individual Defendants soon followed suit, as detailed below.

60.     On February 14, 2017, numerous Individual Defendants collectively sold thousands of shares of their Acacia stock at an average price of $62.24 per share, and none of them were sold pursuant to a 10b5-1 trading plan.  In particular: defendant Rasmussen sold 3,321 shares for proceeds of $206,695.72; defendant Givehchi sold 2,039 shares for proceeds of $126,905.32; defendant Mikkelsen sold 2,032 shares for proceeds of $126,469.65; defendant Shanmugaraj sold 2,029 shares for proceeds of $126,282.93; defendant Shah sold 909 shares for proceeds of $56,575.25; and defendant Gavin sold 678 shares for proceeds of $42,198.04.

61.     On February 23, 2017, Acacia issued a press release announcing fourth quarter 2016 financial results.  Although Acacia generally achieved its forecasted results for the quarter, the Company issued 2017 revenue guidance and an earnings forecast well below what the Company had

led the investing public to expect.  In particular, for the first quarter of 2017, Acacia noted that it

expected revenue to be in the range of $108 million to $114 million, a dramatic slowdown from

previous quarters, and is well below analyst expectations of $137.4 million.  Acacia's earnings

guidance was also disappointing, with the Company expecting non-GAAP EPS between $0.63 and

$0.70, well below analysts' expectations of $0.78.  Although financial guidance plunged, the

Individual Defendants continued to mislead the market in order to keep the Company's stock price

from an utter free-fall.  For example, defendant Shanmugaraj continued to boast about "continued

strong global demand" for Acacia's products, and further proclaimed that Acacia's "***current product

offerings, roadmap products, and development pipeline, position [the Company] well to take

advantage of future growth opportunities***."  Similarly, the press release quoted defendant Gavin as

follows:

> Our fourth quarter results again exceeded our guidance for revenue and non-GAAP
> diluted EPS ***and capped off a strong year at Acacia Communications***. During the
> fourth quarter, we experienced year-over-year revenue growth of 108%, further
> diversified our revenue base, with sales to newer customers outside our original eight
> 2011 customers increasing to 35% of our total revenue from 14% in the first quarter
> of 2016…. ***We believe our market strategy and business model are strong, and
> position us for further growth***.

62.     On February 23, 2017, Acacia also filed its Annual Report on Form 10-K for the year

ended December 31, 2016 with the SEC, signed by defendants Shanmugaraj, Gavin, Murphy,

Swanson, Chung, Mikkelsen, Reiss, Ritchie, and Roche.  The Form 10-K reiterated the same

financial results as the above noted press release, and further assured investors that the Company's

third-party contract manufacturers and foundries were subjected to special requirements in order to

meet the purported "high quality and reliability standards required of [Acacia's] products." The Form

10-K stated:

**Manufacturing**

We contract with third parties to manufacture, assemble and test our products. We utilize a range of CMOS and CMOS-compatible processes to develop and manufacture the coherent DSP ASICs and silicon PICs that are designed into our modules. We select the semiconductor process and foundry that provides the best combination of performance, cost and feature attributes necessary for our products.

***We contract with three third-party contract manufacturers to test, build and inspect modules incorporating our coherent DSP ASICs and silicon PICs for high-volume production of our modules***. Our contract manufacturers also implement many customer-specific configurations and packaging before customer shipments. ***We build the test systems used by our contract manufacturers.*** We also directly manufacture prototype products and limited production quantities during initial new product introduction.

We believe our outsourced manufacturing model enables us to focus our resources and expertise on the design, sale, support and marketing of our products to best meet customer requirements. We also believe that this manufacturing model provides us with the flexibility required to respond to new market opportunities and changes in customer demand, simplifies the scope of our operations and administrative processes and significantly reduces our working capital requirements, while providing the ability to scale production rapidly.

***We subject our third-party contract manufacturers and foundries to qualification requirements in order to meet the high quality and reliability standards required of our products. Our engineers and supply chain personnel work closely with third-party contract manufacturers and fab foundries to increase yield, reduce manufacturing costs, improve product quality and ensure that component sourcing strategies are in place to support our manufacturing needs.***

63.     On February 24, 2017, Acacia's stock tumbled as a result of the disappointing financial forecast, but remained somewhat propped up as a result of the Individual Defendants' assurances of a strong business model, future growth, and high standards of quality control. Specifically, on February 24, 2017, Acacia's stock closed at $54.04 per share, a decrease of more than 14% compared to the previous day's close.

64.     With Acacia's stock price still artificially inflated, certain Individual Defendants continued to dump their shares.  For example, from March 31, 2017 to April 24, 2017, defendant

Murphy sold another 3,269 shares priced between $52.91 and $60.67 for proceeds of $193,722.54, and none of them were sold pursuant to a 10b5-1 trading plan.

65.     On April 25, 2017, news began to surface suggesting that demand was weakening in the market serviced by Acacia.  Specifically, Acacia's competitor, MACOM Technology Solutions Holdings, Inc. ("Macom") reported dismal financial guidance for the following quarter, citing demand slowdown in China and various inventory correction issues.  The same day during a conference call, Macom's CEO was "emphatic" that "there [was] no question that there [was] a cyclical weakness on the carrier base side of the business."  Macom's CEO further explained that the market had "the China correction happening with the Metro/Long Haul provincial deployments, so there's no question that there [are] some headwinds in demand," and "if [the market] didn't have those headwinds in China, I think things would be materially stronger."  On this news, Acacia's stock price declined approximately 11% the following trading day to close at $48.08 per share.  Macom's stock price declined the same day as well, as did several other competitors in the market, including Inphi Corporation, NeoPhotonics Corporation, and Lumentum Holdings Inc.

66.     On May 9, 2017, Acacia issued a press release announcing its financial results for the first quarter of 2017.  The press release provided bleak guidance again, this time for the second quarter of 2017.  In particular, Acacia provided second quarter 2017 EPS guidance of just $0.22 to $0.35 per share on revenues of only $85 million to $95 million, significantly lower than the EPS of $0.74 per share on revenues of $131 million that the market had been led to expect.  During an earnings conference call the following day, defendant Shanmugaraj blamed the downturn on lower demand in China, admitting that Acacia's stockholders were forced to learn this information from the Company's competitors, and also blamed it on variability in the quarterly order rate from its second largest customer, ADVA.  Defendant Shanmugaraj stated:

I would now like to comment on our outlook for the second quarter of 2017. At the midpoint of our guidance range, we expect revenue to be sequentially down 21.7% from the first quarter due to a couple of factors. The primary factor is softening demand from the China market that started in April. *As you may have heard from others in our industry, we are seeing what we believe to be a temporary slowdown in the deployments from carriers in China*, causing our larger China customers to slow down their order rates in the second quarter. The secondary factor is the variability that we are seeing in the quarterly order rate from one of our direct hyperscale customers [ADVA].

67.     Commensurate with the bad news, the May 9, 2017 press release quoted defendants Shanmugaraj and Gavin in their attempts to keep Acacia's stock price afloat by continuing to tout the Company's purportedly strong competitive position, the global demand for its products, and long-term growth prospects, stating:

"We are pleased that our first quarter results came in stronger than we expected at the start of the quarter *driven by demand for our CFP and flex-400G products around the world*," said Raj Shanmugaraj, President and Chief Executive Officer of Acacia Communications. "During the quarter, we made good progress on ramping production of our CFP2-ACO and CFP2-DCO modules with our contract manufacturers and *we continue to see strong customer interest for these products*. We believe that our continued innovation with products like our CFP2- DCO will further advance *our technology leadership position and contribute to our growth in the second half of 2017 and beyond*."

"We believe that our strong balance sheet, which shows a significant cash position and no debt, provides us with the financial flexibility to continue to invest in product development to *further strengthen our competitive position and enable us to bring products to those markets that require a rapid pace of innovation*, like the DCI market," said John Gavin, Chief Financial Officer of Acacia Communications. "For example, we recently announced our next generation Pico DSP ASIC which, when combined with our ball grid array PIC, will support transmission speeds of up to 1.2 Tbps with two carriers of 600 Gbps each. Pico will power our AC1200 module and is focused on DCI applications."

68.     On the above news, Acacia's stock price declined more than 8% on May 10, 2017, closing at $44.48 per share.

69.     On May 15, 2017, while Acacia's stock price was still artificially inflated due to the various misstatements noted above, several Individual Defendants dumped more stock at an average

price of $48.54 per share.  Again, none of the Individual Defendants sold their stock pursuant to a 10b5-1 trading plan.  Specifically, defendant Rasmussen sold 10,060 shares for proceeds of $488,109.19, defendant Shanmugaraj sold 8,983 shares for proceeds of $435,865.94, defendant Mikkelsen sold 7,475 shares for proceeds of $362,649.63, defendant Givehchi sold 7,390 shares for proceeds of $358,522.16, defendant Shah sold 5,112 shares for proceeds of $248,087.92, and defendant Gavin sold 4,634 shares for proceeds of $224,926.48.

70.     On May 31, 2017, Acacia issued a press release cryptically announcing for the first time that the Company had identified a quality issue that it believed "affect[ed an undisclosed] portion of the approximate 1,300 AC400 units and 5,000 CFP units manufactured by one of [the Company's] three contract manufacturers over an approximate four month period."  The press release further noted that Acacia "believ[ed] the root cause of this quality issue ha[d] been identified as a circuit board cleaning process," and that the issue "ha[d] since been eliminated."  The press release also claimed that "manufacturing at this contract manufacturer has resumed" and the "Company does not believe that products currently being shipped are affected by this quality issue."

71.     On July 14, 2017, Acacia issued a press release announcing disappointing preliminary second quarter 2017 results.  In particular, Acacia reported second quarter preliminary revenue of only $77 million to $79 million, with non-GAAP EPS of $0.17 to $0.20, far lower than the EPS of $0.31 and revenue of $91 million expected by analysts.  The Company blamed the shortfall on the above noted "quality issue," and admitted that Acacia experienced supply constraints while trying to build replacement units at the same time that it attempted to meet new demand from customers.  The press release further revealed that Acacia did not anticipate completing remediation efforts with respect to the remaining affected units until the third quarter of 2017, and that the Company now

anticipated third quarter 2017 EPS of $0.25 to $0.40 on revenues of $95 million to $110 million.

The press release stated:

> Acacia Communications, Inc. (NASDAQ: ACIA), a leading provider of high-speed coherent optical interconnect products, today announced certain preliminary financial results for the quarter ended June 30, 2017 and provided preliminary guidance for its third quarter ending September 30, 2017.
>
> "Our second quarter results were ***adversely affected by the quality issue identified at one of our three contract manufacturers that we announced on May 31***. As we previously announced, we identified a circuit board cleaning process as the likely root cause of the quality issue. This cleaning process was eliminated and manufacturing at the impacted contract manufacturer resumed. ***Although we began to ramp manufacturing capacity with our contract manufacturers during the quarter, we experienced supply constraints as capacity was used to both build replacement units and to meet new demand from customers*** for our AC400 and CFP units," said Raj Shanmugaraj, President and Chief Executive Officer of Acacia Communications. "We anticipate completing our remediation efforts with respect to the remaining impacted units during the third quarter of 2017."
>
> "While we are disappointed with the impact that the quality issue had on second quarter results, looking ahead to the third quarter, we believe we are well positioned to meet customer demand for our products, which we believe continues to be driven by the strength of our product capabilities," said John Gavin, Chief Financial Officer of Acacia Communications. "We remain excited about Acacia's future growth opportunities, and believe that the new products we are currently ramping up will be contributors to our anticipated growth in the second half of 2017 over the first half of 2017."

72.     On this news, Acacia's stock price fell 6.3%, or $2.62 per share, on July 14, 2017, to close at $39 compared to the previous trading day's closing of $41.62.

## REASONS THE STATEMENTS WERE IMPROPER

73.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

> (a)     the Company's top two customers both experienced operational and/or sales

problems that were limiting demand for Acacia products, both before and during Acacia's SPO;

(b)      a significant portion of Acacia's pre-SPO sales growth was attributable to projects that were winding down and reducing demand for Acacia's products, including the 4G infrastructure buildout in China; and

(c)      quality issues were negatively affecting Acacia products and the Company was becoming stretched in its attempts to remediate the issue while also meeting current demand for Acacia's products.

## INSIDER SALES BY DEFENDANTS CHUNG, GAVIN, GIVEHCHI, MIKKELSEN, MURPHY, RASMUSSEN, REISS, RITCHIE, SHAH, SHANMUGARAJ, AND SWANSON

74.      Rather than providing the market with correct information, the Insider Selling Defendants used their knowledge of Acacia's material, nonpublic information to sell their personal holdings while the Company's stock was artificially inflated.  As officers and directors of Acacia, defendants were privy to material, nonpublic information about the Company's true business health.  While in possession of this knowledge, the Insider Selling Defendants each made suspicious sales for their own personal benefits.

75.      Defendant Reiss sold 1,446,104 shares of his personally and indirectly held Acacia stock for proceeds of $139,549,036.  Defendant Reiss's sales were timed to maximize profit from Acacia's then artificially inflated stock price.  Defendant Reiss's sales are suspicious given that his stock sales during the period tainted by improper statements represented almost 12% of his personal and indirect holdings, and he did not personally or indirectly sell a single share in the year before that time.

76.      Defendant Chung sold 1,596,202 shares of his personally held Acacia stock for proceeds of $96,220,993.  Defendant Chung's sales were timed to maximize profit from Acacia's then artificially inflated stock price.  Defendant Chung's sales are suspicious given that his stock

sales during the period tainted by improper statements represented over 55% of his holdings, and he did not sell a single share in the year before that time.

77.     Defendant Rasmussen sold 293,121 shares of his personally held Acacia stock for proceeds of $20,476,861.42.  Defendant Rasmussen's sales were timed to maximize profit from Acacia's then artificially inflated stock price.  Defendant Rasmussen's sales are suspicious given that his stock sales during the period tainted by improper statements represented almost 28% of his holdings, compared to the 9.1% he sold in the year before that time.

78.     Defendant Givehchi sold 289,193 shares of his personally held Acacia stock for proceeds of $20,285,090.81.  Defendant Givehchi's sales were timed to maximize profit from Acacia's then artificially inflated stock price.  Defendant Givehchi's sales are suspicious given that his stock sales during the period tainted by improper statements represented almost 25% of his holdings, compared to the 8.2% he sold in the year before that time.

79.     Defendant Mikkelsen sold 289,247 shares of his personally held Acacia stock for proceeds of $20,269,536.59.  Defendant Mikkelsen's sales were timed to maximize profit from Acacia's then artificially inflated stock price.  Defendant Mikkelsen's sales are suspicious given that his stock sales during the period tainted by improper statements represented almost 25% of his holdings, compared to the 8.2% he sold in the year before that time.

80.     Defendant Shanmugaraj sold 189,175 shares of his personally held Acacia stock for proceeds of $15,038,839.56.  Defendant Shanmugaraj's sales were timed to maximize profit from Acacia's then artificially inflated stock price.  Defendant Shanmugaraj's sales are suspicious given that his stock sales during the period tainted by improper statements represented over 14% of his holdings, compared to the 3.8% he sold in the year before that time.

81.     Defendant Shah sold 132,298 shares of his personally held Acacia stock for proceeds of $9,506,575.33.   Defendant Shah's sales were timed to maximize profit from Acacia's then artificially inflated stock price.   Defendant Shah's sales are suspicious given that his stock sales during the period tainted by improper statements represented over 23% of his holdings, compared to the 5.2% he sold in the year before that time.

82.     Defendant Gavin sold 48,630 shares of his personally held Acacia stock for proceeds of $3,699,330.42.   Defendant Gavin's sales were timed to maximize profit from Acacia's then artificially inflated stock price.   Defendant Gavin's sales are suspicious given that his stock sales during the period tainted by improper statements represented nearly 29% of his holdings, compared to the 7% he sold in the year before that time.

83.     Defendant Murphy sold 34,458 shares of his personally held Acacia stock for proceeds of $2,122,673.53. Defendant Murphy's sales were timed to maximize profit from Acacia's then artificially inflated stock price.   Defendant Murphy's sales are suspicious given that his stock sales during the period tainted by improper statements represented over 52.5% of his holdings, and he did not sell a single share in the year before that time.

84.     Defendant Ritchie sold 5,280 shares of his personally held Acacia stock for proceeds of $379,368. Defendant Ritchie's sales were timed to maximize profit from Acacia's then artificially inflated stock price.   Defendant Ritchie's sales are suspicious given that his stock sales during the period tainted by improper statements represented over 25.8% of his holdings, and he did not sell a single share in the year before that time.

85.     Defendant Swanson sold 2,640 shares of his personally held Acacia stock for proceeds of $254,760.   Defendant Swanson's sales were timed to maximize profit from Acacia's then artificially inflated stock price.

86.     In sum, defendants Chung, Gavin, Givehchi, Mikkelsen, Murphy, Rasmussen, Reiss, Ritchie, Shah, Shanmugaraj, and Swanson sold over $327.8 million worth of stock at artificially inflated prices as detailed by the table below:

| INDIVIDUAL DEFENDANTS TOTAL SALES<br>August 11, 2016 to July 13, 2017 | | | | |
|---|---|---|---|---|
| **Insider Last Name** | **Transaction Date** | **Shares** | **Price** | **Proceeds** |
| **Chung** | 10/13/2016 | 346,202 | $96.50 | $33,408,493.00 |
| | 3/9/2017 | 1,250,000 | $50.25 | $62,812,500.00 |
| **Total** | | **1,596,202** | | **$96,220,993.00** |
| | | | | |
| **Gavin** | 10/13/2016 | 25,501 | $96.50 | $2,460,846.50 |
| | 2/14/2017 | 678 | $62.24 | $42,198.04 |
| | 4/17/2017 | 17,416 | $54.51 | $949,271.27 |
| | 4/17/2017 | 401 | $55.08 | $22,088.12 |
| | 5/15/2017 | 4,634 | $48.54 | $224,926.48 |
| **Total** | | **48,630** | | **$3,699,330.42** |
| | | | | |
| **Givehchi** | 10/13/2016 | 98,846 | $96.50 | $9,538,639.00 |
| | 1/5/2017 | 35,598 | $60.95 | $2,169,769.30 |
| | 1/5/2017 | 8,600 | $61.93 | $532,569.62 |
| | 1/5/2017 | 26,500 | $60.96 | $1,615,455.90 |
| | 1/5/2017 | 6,400 | $61.90 | $396,131.20 |
| | 1/5/2017 | 500 | $63.14 | $31,571.00 |
| | 2/1/2017 | 8,330 | $55.01 | $458,237.47 |
| | 2/1/2017 | 2,600 | $55.92 | $145,395.12 |
| | 2/1/2017 | 1,500 | $56.97 | $85,456.95 |
| | 2/1/2017 | 1,500 | $58.17 | $87,256.95 |
| | 2/1/2017 | 800 | $58.81 | $47,048.24 |
| | 2/1/2017 | 6,400 | $54.95 | $351,703.04 |
| | 2/1/2017 | 1,800 | $55.87 | $100,564.92 |
| | 2/1/2017 | 1,600 | $57.19 | $91,499.04 |
| | 2/1/2017 | 1,200 | $58.42 | $70,108.20 |
| | 2/1/2017 | 100 | $59.61 | $5,961.00 |
| | 2/14/2017 | 2,039 | $62.24 | $126,905.32 |
| | 3/1/2017 | 2,900 | $51.10 | $148,199.86 |
| | 3/1/2017 | 11,530 | $52.21 | $601,946.71 |
| | 3/1/2017 | 300 | $52.70 | $15,810.00 |
| | 3/1/2017 | 2,200 | $51.14 | $112,504.92 |
| | 3/1/2017 | 8,900 | $52.23 | $464,883.49 |
| | 4/3/2017 | 4,969 | $58.44 | $290,378.42 |
| | 4/3/2017 | 8,961 | $59.38 | $532,095.22 |
| | 4/3/2017 | 800 | $60.34 | $48,272.00 |
| | 4/3/2017 | 3,660 | $58.40 | $213,732.29 |
| | 4/3/2017 | 6,740 | $59.39 | $400,302.08 |

| | | | |
|---|---|---|---|
| | 4/3/2017 | 700 | $60.11 | $42,080.01 |
| | 5/1/2017 | 9,949 | $46.36 | $461,212.76 |
| | 5/1/2017 | 4,781 | $46.91 | $224,275.75 |
| | 5/1/2017 | 8,325 | $46.40 | $386,280.00 |
| | 5/1/2017 | 2,775 | $46.96 | $130,322.88 |
| | 5/15/2017 | 7,390 | $48.51 | $358,522.16 |
| **Total** | | **289,193** | | **$20,285,090.81** |
| | | | | |
| **Mikkelsen** | 10/13/2016 | 98,846 | $96.50 | $9,538,639.00 |
| | 1/5/2017 | 62,664 | $60.94 | $3,818,944.68 |
| | 1/5/2017 | 14,162 | $61.97 | $877,646.05 |
| | 1/5/2017 | 400 | $62.75 | $25,098.00 |
| | 1/5/2017 | 300 | $63.50 | $19,050.00 |
| | 2/1/2017 | 14,642 | $54.98 | $805,058.16 |
| | 2/1/2017 | 4,500 | $55.92 | $251,617.95 |
| | 2/1/2017 | 1,900 | $56.88 | $108,080.93 |
| | 2/1/2017 | 3,000 | $57.97 | $173,898.90 |
| | 2/1/2017 | 1,600 | $58.65 | $93,832.96 |
| | 2/1/2017 | 200 | $59.61 | $11,922.00 |
| | 2/14/2017 | 2,032 | $62.24 | $126,469.65 |
| | 3/1/2017 | 21,149 | $51.11 | $1,080,855.60 |
| | 3/1/2017 | 4,693 | $52.08 | $244,412.85 |
| | 4/3/2017 | 8,105 | $58.46 | $473,788.31 |
| | 4/3/2017 | 16,537 | $59.40 | $982,317.64 |
| | 4/3/2017 | 1,200 | $60.50 | $72,594.96 |
| | 5/1/2017 | 18,774 | $46.38 | $870,818.85 |
| | 5/1/2017 | 7,068 | $46.95 | $331,840.48 |
| | 5/15/2017 | 7,475 | $48.52 | $362,649.63 |
| **Total** | | **289,247** | | **$20,269,536.59** |
| | | | | |
| **Murphy** | 11/15/2016 | 1,582 | $69.19 | $109,458.58 |
| | 12/15/2016 | 3,785 | $66.79 | $252,785.01 |
| | 1/3/2017 | 6,752 | $62.15 | $419,636.80 |
| | 1/9/2017 | 17,157 | $60.43 | $1,036,797.51 |
| | 1/30/2017 | 1,608 | $60.67 | $97,557.36 |
| | 3/31/2017 | 1,668 | $60.67 | $101,197.56 |
| | 4/3/2017 | 1,201 | $59.46 | $71,410.50 |
| | 4/24/2017 | 400 | $52.91 | $21,164.48 |
| | 7/3/2017 | 305 | $41.53 | $12,665.74 |
| **Total** | | **34,458** | | **$2,122,673.53** |
| | | | | |
| **Rasmussen** | 10/13/2016 | 98,846 | $96.50 | $9,538,639.00 |
| | 1/5/2017 | 61,928 | $60.95 | $3,774,313.43 |
| | 1/5/2017 | 14,898 | $61.94 | $922,850.65 |
| | 1/5/2017 | 400 | $62.78 | $25,112.00 |
| | 1/5/2017 | 300 | $63.50 | $19,050.00 |
| | 2/1/2017 | 14,992 | $54.99 | $824,378.60 |
| | 2/1/2017 | 4,350 | $56.01 | $243,659.16 |
| | 2/1/2017 | 2,300 | $57.03 | $131,178.89 |

| | | | | |
|---|---|---|---|---|
| | 2/1/2017 | 3,200 | $58.21 | $186,264.96 |
| | 2/1/2017 | 800 | $58.66 | $46,924.00 |
| | 2/1/2017 | 200 | $59.61 | $11,922.00 |
| | 2/14/2017 | 3,321 | $62.24 | $206,695.72 |
| | 3/1/2017 | 20,882 | $51.12 | $1,067,412.66 |
| | 3/1/2017 | 4,960 | $52.10 | $258,393.68 |
| | 4/3/2017 | 7,625 | $58.47 | $445,868.83 |
| | 4/3/2017 | 16,617 | $59.37 | $986,541.32 |
| | 4/3/2017 | 1,600 | $60.43 | $96,692.96 |
| | 5/1/2017 | 16,604 | $46.35 | $769,525.66 |
| | 5/1/2017 | 9,238 | $46.91 | $433,328.71 |
| | 5/15/2017 | 10,060 | $48.52 | $488,109.19 |
| **Total** | | **293,121** | | **$20,476,861.42** |
| | | | | |
| **Reiss** | 10/13/2016 | 1,445,307 | $96.50 | $139,472,125.50 |
| | 10/13/2016 | 797 | $96.50 | $76,910.50 |
| **Total** | | **1,446,104** | | **$139,549,036.00** |
| | | | | |
| **Ritchie** | 10/13/2016 | 2,640 | $96.50 | $254,760.00 |
| | 5/9/2017 | 2,640 | $47.20 | $124,608.00 |
| **Total** | | **5,280** | | **$379,368.00** |
| | | | | |
| **Shah** | 10/13/2016 | 47,917 | $96.50 | $4,623,990.50 |
| | 1/5/2017 | 23,800 | $60.96 | $1,450,886.08 |
| | 1/5/2017 | 5,100 | $61.93 | $315,858.81 |
| | 1/5/2017 | 500 | $63.14 | $31,571.00 |
| | 1/5/2017 | 8,280 | $60.96 | $504,738.86 |
| | 1/5/2017 | 1,500 | $62.06 | $93,087.00 |
| | 2/1/2017 | 1,960 | $55.03 | $107,853.90 |
| | 2/1/2017 | 500 | $56.11 | $28,056.00 |
| | 2/1/2017 | 300 | $57.19 | $17,156.01 |
| | 2/1/2017 | 500 | $58.31 | $29,155.00 |
| | 2/1/2017 | 5,800 | $55.02 | $319,140.94 |
| | 2/1/2017 | 1,900 | $56.16 | $106,700.58 |
| | 2/1/2017 | 800 | $57.47 | $45,974.00 |
| | 2/1/2017 | 1,200 | $58.52 | $70,223.52 |
| | 2/1/2017 | 100 | $59.61 | $5,961.00 |
| | 2/14/2017 | 909 | $62.24 | $56,575.25 |
| | 3/1/2017 | 602 | $51.11 | $30,765.93 |
| | 3/1/2017 | 2,658 | $52.24 | $138,866.68 |
| | 3/1/2017 | 2,000 | $51.20 | $102,408.00 |
| | 3/1/2017 | 7,600 | $52.23 | $396,932.80 |
| | 3/1/2017 | 200 | $52.81 | $10,561.00 |
| | 4/3/2017 | 1,363 | $58.52 | $79,767.94 |
| | 4/3/2017 | 1,797 | $59.45 | $106,830.93 |
| | 4/3/2017 | 100 | $60.51 | $6,051.00 |
| | 4/3/2017 | 3,800 | $58.51 | $222,346.36 |
| | 4/3/2017 | 5,600 | $59.43 | $332,820.32 |
| | 4/3/2017 | 400 | $60.52 | $24,208.00 |

|  | 5/15/2017 | 5,112 | $48.53 | $248,087.92 |
|---|---|---|---|---|
| **Total** |  | **132,298** |  | **$9,506,575.33** |
|  |  |  |  |  |
| **Shanmugaraj** | 10/13/2016 | 93,500 | $96.50 | $9,022,750.00 |
|  | 10/13/2016 | 14,663 | $96.50 | $1,414,979.50 |
|  | 1/5/2017 | 7,224 | $60.93 | $440,134.48 |
|  | 1/5/2017 | 1,318 | $61.93 | $81,622.16 |
|  | 1/5/2017 | 58 | $62.72 | $3,637.76 |
|  | 1/5/2017 | 2,688 | $60.93 | $163,770.97 |
|  | 1/5/2017 | 491 | $61.93 | $30,407.04 |
|  | 1/5/2017 | 21 | $62.72 | $1,317.12 |
|  | 1/5/2017 | 2,688 | $60.93 | $163,770.97 |
|  | 1/5/2017 | 491 | $61.93 | $30,407.04 |
|  | 1/5/2017 | 21 | $62.72 | $1,317.12 |
|  | 1/5/2017 | 5,676 | $60.70 | $344,519.58 |
|  | 1/5/2017 | 2,924 | $61.28 | $179,189.15 |
|  | 1/5/2017 | 2,112 | $60.70 | $128,193.33 |
|  | 1/5/2017 | 1,088 | $61.28 | $66,675.03 |
|  | 1/5/2017 | 2,112 | $60.70 | $128,193.33 |
|  | 1/5/2017 | 1,088 | $61.28 | $66,675.03 |
|  | 2/2/2017 | 3,446 | $57.08 | $196,696.99 |
|  | 2/2/2017 | 4,866 | $57.82 | $281,371.10 |
|  | 2/2/2017 | 288 | $58.52 | $16,854.91 |
|  | 2/2/2017 | 1,283 | $57.08 | $73,233.38 |
|  | 2/2/2017 | 1,811 | $57.82 | $104,719.08 |
|  | 2/2/2017 | 106 | $58.52 | $6,203.54 |
|  | 2/2/2017 | 1,283 | $57.08 | $73,233.38 |
|  | 2/2/2017 | 1,811 | $57.82 | $104,719.08 |
|  | 2/2/2017 | 106 | $58.52 | $6,203.54 |
|  | 2/3/2017 | 4,118 | $56.28 | $231,748.69 |
|  | 2/3/2017 | 2,082 | $57.08 | $118,830.15 |
|  | 2/3/2017 | 1,591 | $56.28 | $89,536.71 |
|  | 2/3/2017 | 809 | $57.08 | $46,173.68 |
|  | 2/3/2017 | 1,591 | $56.28 | $89,536.71 |
|  | 2/3/2017 | 809 | $57.08 | $46,173.68 |
|  | 2/14/2017 | 2,029 | $62.24 | $126,282.93 |
|  | 3/1/2017 | 286 | $50.97 | $14,577.99 |
|  | 3/1/2017 | 3,714 | $52.30 | $194,235.14 |
|  | 3/1/2017 | 107 | $50.97 | $5,454.00 |
|  | 3/1/2017 | 1,393 | $52.30 | $72,851.25 |
|  | 3/1/2017 | 107 | $50.97 | $5,454.00 |
|  | 3/1/2017 | 1,393 | $52.30 | $72,851.25 |
|  | 3/2/2017 | 4,000 | $51.21 | $204,841.60 |
|  | 3/2/2017 | 1,500 | $51.21 | $76,815.60 |
|  | 3/2/2017 | 1,500 | $51.21 | $76,815.60 |
|  | 5/15/2017 | 8,983 | $48.52 | $435,865.94 |
| **Total** |  | **189,175** |  | **$15,038,839.56** |
|  |  |  |  |  |
| **Swanson** | 10/13/2016 | 2,640 | $96.50 | $254,760.00 |

| Total | | 2,640 | | $254,760.00 |
|---|---|---|---|---|
| | | | | |
| TOTALS | | 4,326,348 | | $327,803,064.67 |

## THE MATERIALLY MISLEADING PROXY

87.     The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the below noted defendant.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

88.     On April 6, 2017, defendants Shanmugaraj, Mikkelsen, Swanson, Reiss, Chung, Ritchie, and Roche caused Acacia to issue the Proxy in connection with the 2017 Annual Stockholders meeting, held on May 18, 2017.  In the Proxy, defendants solicited stockholder votes to, among other things, reelect defendants Shanmugaraj and Mikkelsen to the Board.  Defendants issued materially misleading statements with respect to the solicited vote.

89.     The Proxy stated the following in support of reelecting defendants Shanmugaraj and Mikkelsen to the Board:

**Nominees**

Based on the recommendation of the Nominating and Corporate Governance Committee of our Board of Directors ("Nominating and Corporate Governance Committee"), our Board of Directors has nominated Murugesan Shanmugaraj and Benny P. Mikkelsen for election as directors to serve for a three-year term ending at the 2020 annual meeting or until their successors are elected and qualified. Each of the nominees is a current member of our Board of Directors and has consented to serve if elected.

* * *

*Audit Committee*

Our Audit Committee's responsibilities include:

* * *

- reviewing and discussing with management and the registered public accounting firm our **annual and quarterly financial statements and related disclosures**; [and]

- **monitoring our internal control over financial reporting, disclosure controls and procedures** and code of business conduct and ethics;

\* \* \*

**Board Processes**

*Oversight of Risk*

**Our Board of Directors oversees our risk management processes directly and through its Committees**. Our management is responsible for risk management on a day-to-day basis. The role of our Board and its committees is to oversee the risk management activities of our management. They fulfill this duty by discussing with management the policies and practices utilized by management in assessing and managing risks and providing input on those policies and practices. In general, **our Board oversees risk management activities relating to business strategy**, acquisitions, capital allocation, organizational structure and **certain operational risks**; **our Audit Committee oversees risk management activities related to financial controls and legal and compliance risks**; our Nominating and Corporate Governance Committee oversees risk management activities relating to the composition of our Board; and our Compensation Committee oversees risk management activities relating to our compensation policies and practices and management succession planning. **Each Committee reports to the full Board on a regular basis, including reports with respect to each Committee's risk oversight activities as appropriate**. In addition, since risk issues often overlap, Committees from time to time request that the full Board discuss particular risks.

\* \* \*

*Participation in our Follow-On Public Offering*

On October 13, 2016, we closed our follow-on public offering in which we issued and sold 1,210,302 shares of common stock and certain selling stockholders sold an additional 3,289,698 shares.  The price per share to the public was $100.00, resulting in aggregate proceeds to the company of approximately $116.8 million, net of underwriters' discounts and commissions, before deduction of offering expenses of approximately $1.2 million. The selling stockholders in our follow-on public offering included each of our executive officers, entities affiliated with Summit Partners, L.P., Commonwealth Capital Ventures and Matrix Partners and certain of our directors as set forth in the table below.  We did not receive any proceeds from the sale of shares by the selling stockholders.

| Name | Nature of Relationship | Shares | Aggregate Proceeds(1) |
|---|---|---|---|
| Murugesan "Raj" Shanmugaraj | Executive Officer | 108,163 | $10,437,730 |
| John F. Gavin | Executive Officer | 25,501 | $2,460,847 |
| Benny P. Mikkelsen | Executive Officer | 98,846 | $9,538,639 |
| Christian J. Rasmussen | Executive Officer | 98,846 | $9,538,639 |
| Mehrdad Givehchi | Executive Officer | 98,846 | $9,538,639 |
| Bhupendra C. Shah | Executive Officer | 47,917 | $4,623,991 |
| Entities Affiliated with Matrix Partners | Significant Stockholder | 1,448,493 (2) | $139,779,575 |
| Commonwealth Capital Ventures IV L.P. | Significant Stockholder | 726,426 | $70,100,109 |
| Entities Affiliated with Summit Partners, L.P. | Significant Stockholder | 346,202 (3) | $33,408,493 |
| Eric Swanson | Director | 2,640 | $254,760 |
| Stan Reiss | Director | 1,448,493 (2) | $139,779,575 |
| John Ritchie | Director | 2,640 | $254,760 |

90.     Defendants' statements misleadingly suggested that: (i) the Board maintained adequate compliance, internal control, disclosure review, and reporting programs to mitigate wrongdoing and apprise the Board of significant risks; (ii) the Audit Committee adequately reviewed the Company's financial statements and disclosures, and monitored disclosure and internal controls to ensure they were effective.  The Proxy omitted any disclosures regarding: (i) the decreasing demands for Acacia's products from the Company's largest customers; (ii) the quality control issues that were negatively affecting Acacia products; and (iii) Acacia's improperly inflated financial guidance.  In addition, while the Proxy disclosed that defendants Shanmugaraj and Mikkelsen

collectively sold approximately $20 million worth of their personally held Acacia stocks in connection with the SPO, the Proxy failed to disclose that such sales were artificially inflated and improperly made while both defendants were in possession of material, adverse information concerning Acacia's business, operations, and prospects.

91.     The Proxy harmed Acacia by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  As a result of the Individual Defendants' misleading statements in the Proxy, Acacia's stockholders voted to reelect defendants Shanmugaraj and Mikkelsen to Acacia's Board.

### DAMAGES TO ACACIA

92.     As a result of the Individual Defendants' improprieties, Acacia disseminated improper, public statements concerning the Company's business prospects and expected growth. These improper statements have devastated Acacia's credibility as reflected by the Company's more than $2 billion, or 56.6%, market capitalization loss from the October 2016 SPO through mid-July 2017.

93.     Acacia's performance issues also damaged its reputation within the business community and in the capital markets.  In addition to price, Acacia's current and potential customers consider a company's ability to accurately value its business prospects and evaluate sales and growth potential.  Businesses are less likely to award contracts to companies that are uncertain about their own financial conditions.  Acacia's ability to raise equity capital or debt on favorable terms in the future is now impaired.  In addition, the Company stands to incur higher marginal costs of capital and debt because the improper statements and misleading projections disseminated by the Individual Defendants have materially increased the perceived risks of investing in and lending money to the Company.

94.     Further, as a direct and proximate result of the Individual Defendants' actions, Acacia has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws; and

(b)     costs incurred from compensation and benefits paid to the defendants who have breached their duties to Acacia.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

95.     Plaintiff brings this action derivatively in the right and for the benefit of Acacia to redress injuries suffered, and to be suffered, by Acacia as a direct result of violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Acacia is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

96.     Plaintiff will adequately and fairly represent the interests of Acacia in enforcing and prosecuting its rights.

97.     Plaintiff was a stockholder of Acacia at the time of the wrongdoing complained of, has continuously been a stockholder since that time, and is a current Acacia stockholder.

98.     The current Board of Acacia consists of the following eight individuals: defendants Shanmugaraj, Mikkelsen, Roche, Reiss, Swanson, Chung, and Ritchie and non-defendant David J. Aldrich.  Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Shanmugaraj, Mikkelsen, Roche, Reiss, Swanson, Chung, and Ritchie Face a Substantial Likelihood of Liability for Their Misconduct**

99.     The principal duty of the Board is to ensure that the Company operates in compliance with all applicable laws and regulations.  Defendants Shanmugaraj, Mikkelsen, Roche, Reiss, Swanson, Chung, and Ritchie face a substantial likelihood of liability for repeatedly failing to comply with this duty.

100.    As alleged above, seven of the eight current Board members, including defendants Shanmugaraj, Mikkelsen, Roche, Reiss, Swanson, Chung, and Ritchie, violated section 14(a) of the Exchange Act by at least negligently making the misstatements and omissions in the Proxy.  Each of these defendants further breached their fiduciary duties of loyalty by making improper statements in the Company's press releases and SEC filings regarding Acacia's business, operations, and prospects.  Accordingly, demand is excused because a majority of the Board faces a substantial likelihood of liability.

101.    Six of the eight current Board members, comprising a majority of the Board, improperly sold Acacia stock under highly suspicious circumstances including defendants Chung, Mikkelsen, Reiss, Ritchie, Shanmugaraj, and Swanson.  These defendants possessed material, nonpublic company information and used that information to benefit themselves.  Defendants Chung, Mikkelsen, Reiss, Ritchie, Shanmugaraj, and Swanson sold stock based on this knowledge of material, nonpublic company information regarding quality control problems at Acacia and the decreasing demands for the Company's core products from its largest customers.  In particular, while in possession of material, adverse, and nonpublic information about Acacia: defendant Chung sold 1,596,202 shares for proceeds of $96,220,993; defendant Mikkelsen sold 289,247 shares for proceeds of $20,269,536.59; defendant Reiss sold 1,446,104 shares for proceeds of $139,549,036;

defendant Ritchie sold 5,280 shares for proceeds of $379,368; defendant Shanmugaraj sold 189,175 shares for proceeds of $15,038,839.56; and defendant Swanson sold 2,640 shares for proceeds of $254,760.  Accordingly, defendants Chung, Mikkelsen, Reiss, Ritchie, Shanmugaraj, and Swanson face a substantial likelihood of liability for breach of their fiduciary duty of loyalty.  Any demand upon defendants Chung, Mikkelsen, Reiss, Ritchie, Shanmugaraj, and Swanson is futile.

102.    Defendants Chung, Reiss, and Ritchie, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance.  The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and approved the improper press releases made to the public.  Despite their knowledge or reckless disregard, the Audit Committee Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing described herein.  Thus, the Audit Committee Defendants face a substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

103.    Plaintiff has not made any demand on stockholders of Acacia to instate this action since such demand would be a futile and useless act for the following reasons:

(a)    Acacia is a publicly traded company with more than 39.3 million shares outstanding, held by hundreds or thousands of stockholders;

(b)    Making a demand on such a number of stockholders would be impossible for plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

(c)    Making demand on all stockholders would force plaintiff to incur huge

expenses, assuming all stockholders could be individually identified.

## COUNT I

### Against Defendants Shanmugaraj, Mikkelsen, Ritchie, Roche, Reiss, Swanson, and Chung for Violation of Section 14(a) of the Exchange Act

104.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

105.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants Shanmugaraj, Mikkelsen, Ritchie, Roche, Reiss, Swanson, and Chung.  The section 14(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the nonfraud claims.

106.    Defendants Shanmugaraj, Mikkelsen, Ritchie, Roche, Reiss, Swanson, and Chung negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to stockholders which were contained in the Proxy.  The Proxy contained a proposal to Acacia's stockholders urging stockholders to reelect defendants Shanmugaraj and Mikkelsen to the Board.  The Proxy, however, misrepresented and failed to disclose that: (i) the Company was experiencing decreasing demands for Acacia's products from the Company's largest customers; (ii) the Company was experiencing quality control issues that were negatively affecting Acacia products; and (iii) Acacia's financial guidance was improperly inflated.  In addition, the Proxy failed to disclose that defendants Shanmugaraj and Mikkelsen personally sold tens of millions of dollars' worth of Acacia stock at artificially inflated prices while both defendants were in possession of material adverse information concerning Acacia's business, operations, and prospects.  By reasons

of the conduct alleged herein, defendants Shanmugaraj, Mikkelsen, Ritchie, Roche, Reiss, Swanson, and Chung violated section 14(a) of the Exchange Act.  As a direct and proximate result of these defendants' wrongful conduct, Acacia misled and/or deceived its stockholders by making misleading statements that were an essential link in stockholders heeding Acacia's recommendation to reelect defendants Shanmugaraj and Mikkelsen to the Board.

107.    The misleading information contained in the Proxy was material to Acacia's stockholders in determining whether or not to reelect defendants Shanmugaraj and Mikkelsen.  This information was also material to the integrity of the directors that were proposed for election to the Board.  The proxy solicitation process in connection with the Proxy was an essential link in the reelection of these nominees to the Board.

108.    Plaintiff, on behalf of Acacia, thereby seeks relief for damages inflicted upon the Company based upon the misleading Proxy in connection with the improper reelection of the members of the Board.

## COUNT II

### Against the Individual Defendants for Breach of Fiduciary Duty

109.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110.    The Individual Defendants owed and owe Acacia fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Acacia the highest obligation of good faith, fair dealing, loyalty, and due care.

111.    The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their

duty of good faith by creating a culture of lawlessness within Acacia, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

112.    The Officer Defendants either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing: (i) demand for Acacia's core products was dwindling, particularly with respect to the Company's largest customers; (ii) quality control issues were stretching the Company as it attempted to remediate problematic product shipments while also meeting demand for new product orders; and (iii) defendants' positive statements about Acacia's business, operations, and prospects were materially misleading. Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

113.    The Director Defendants, as directors of the Company, owed Acacia the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity detailed herein.  The Director Defendants knew or were reckless in not knowing that: (i) demand for Acacia's core products was dwindling, particularly with respect to the Company's largest customers; (ii) quality control issues were stretching the Company as it attempted to remediate problematic product shipments while also meeting demand for new product orders; and (iii) defendants' positive statements about Acacia's business, operations, and prospects were materially misleading.  Accordingly, the Director Defendants breached their duty of loyalty to the Company.

114.    The Audit Committee Defendants breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight,

and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

115.    The Insider Selling Defendants breached their duty of loyalty by selling Acacia stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's stockholders.  The information described above was proprietary, nonpublic information concerning the Company's future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Acacia common stock.

116.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Acacia has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

117.    Plaintiff, on behalf of Acacia, has no adequate remedy at law.

<u>**COUNT III**</u>

**Against the Individual Defendants for Waste of Corporate Assets**

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.    As a result of the wrongdoing detailed herein, and by failing to conduct proper supervision, the Individual Defendants have caused Acacia to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

120.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

121.    Plaintiff, on behalf of Acacia, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

122.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Acacia.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Acacia.

124.    The Insider Selling Defendants sold Acacia stock while in possession of material, adverse nonpublic information that artificially inflated the price of Acacia stock.  As a result, these defendants profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

125.    Plaintiff, as a stockholder and representative of Acacia, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

126.    Plaintiff, on behalf of Acacia, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Acacia, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' violation of securities law, breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing Acacia to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Acacia and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.      a provision to control insider selling;

2.      a proposal to strengthen the Company's controls over financial reporting;

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

4.      a provision to permit the stockholders of Acacia to nominate at least three candidates for election to the Board; and

5.      a proposal to strengthen Acacia's oversight of its disclosure procedures;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Acacia has an effective remedy;

D.      Awarding to Acacia restitution from defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the defendants, including all ill-gotten gains from insider selling by defendants;

E.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

**WHEREFORE, the Plaintiff demands a trial by jury.**

**Dated:          November 28, 2017**


Peter Charles Horstmann, Esq.
BBO #556377
Law Offices of Peter C. Horstmann
450 Lexington Street, Suite 101
Newton, MA 02466
 (617) 723-1980
*pete@horstmannlaw.com*

---

TERENCE K. ANKNER
800 Boylston Street, Suite 2520
Boston, MA  02199
Telephone: (617) 859-9999
Facsimile: (617) 859-9998
E-mail: tka@anknerlaw.com


ROBBINS ARROYO LLP
BRIAN J. ROBBINS
FELIPE J. ARROYO
STEVEN R. WEDEKING
600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
           farroyo@robbinsarroyo.com
           swedeking@robbinsarroyo.com

Attorneys for Plaintiff